UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CRAWFORD & SONS, LTD. PROFIT
SHARING PLAN, JAMES A. CRAWFORD
PROFIT SHARING PLAN, EAST PROSPECT
STATE BANK, EQUITABLE BANK,
FIRST NATIONAL BANK (SCOTT CITY),
FIRST SECURITY, STATE BANK,
NORTHWEST BANK, PEOPLE'S BANK,
SAND RIDGE BANK, BLUESTEM NATIONAL
BANK, FIRST VICTORIA NATIONAL BANK,
AMERICAN SAVINGS, FSB, MUTUAL
FEDERAL SAVINGS BANK, FIRST
NATIONAL BANK (SMITH CENTER),
THE DIME SAVINGS BANK, THIRD
FEDERAL SAVINGS BANK, FIDELITY
BANK OF FLORIDA, CITIZENS NATIONAL
BANK, CITY NATIONAL BANK,

Plaintiffs,

-against-

ROCHELLE BESSER, WALLACE I. BESSER,
BARRY DRAYER, RW PROFESSIONAL
LEASING SERVICES, INC.,

Defendants.

## AMENDED COMPLAINT

*MARGOLIN & PIERCE, LLP*

Attorney(s) for    *Crawford & Sons, et al.*
1370 Avenue of the Americas
New York, New York 10019
(212) 247-4844

To

Attorney(s) for

Service of a copy of the within is hereby admitted.

Dated:..........................................  ..........

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CRAWFORD & SONS, LTD. PROFIT SHARING PLAN, JAMES A. CRAWFORD PROFIT SHARING PLAN, EAST PROSPECT STATE BANK, EQUITABLE BANK, FIRST NATIONAL BANK (SCOTT CITY), FIRST SECURITY, STATE BANK, NORTHWEST BANK, PEOPLE'S BANK, SAND RIDGE BANK, BLUESTEM NATIONAL BANK, FIRST VICTORIA NATIONAL BANK, AMERICAN SAVINGS, FSB, MUTUAL FEDERAL SAVINGS BANK, FIRST NATIONAL BANK (SMITH CENTER), THE DIME SAVINGS BANK, THIRD FEDERAL SAVINGS BANK, FIDELITY BANK OF FLORIDA, CITIZENS NATIONAL BANK, CITY NATIONAL BANK, | Index No. 02CV 3442 (ADS) <br><br> **AMENDED COMPLAINT** |

Plaintiffs,

-against-

ROCHELLE BESSER, WALLACE I. BESSER,
BARRY DRAYER, RW PROFESSIONAL
LEASING SERVICES, INC.,

Defendants.

Plaintiffs, as listed in the caption and as alleged below, by their attorneys Margolin & Pierce, LLP, for their amended complaint herein, allege:

### The Parties

1.      Crawford & Son, Ltd. Profit Sharing Plan is a retirement plan for the benefit of retired, present and future employees of Crawford & Sons, Ltd., a New York Corporation with its principal place of business at 113 Chapel Street, Fayetteville, New York.

1

2.     James A. Crawford Profit Sharing Plan is a retirement plan for the benefit of retired, present and future employees of James A. Crawford, a New York corporation with its principal place of business at 113 Chapel Street, Fayetteville, New York. (Crawford & Sons and James A. Crawford are the only plaintiffs that are not financial institutions as hereinafter defined.)

3.     Plaintiff East Prospect State Bank is a bank organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at South Main Street, East Prospect, Pennsylvania. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

4.     Plaintiff Equitable Bank is a bank organized and existing under the laws of the State of Florida, with its principal place of business located at 633 South Federal Highway, Fort Lauderdale, Florida. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

5.     Plaintiff First National Bank (Scott City) is a national bank organized and existing under 12 U.S.C. Chapter 2, with its principal place of business located at 501 Main Street, Scott City, Kansas. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

6.     Plaintiff First Security State Bank is a bank organized and existing under the laws of the State of Missouri, with its principal place of business located at 323 Word Avenue, Caruthersville, Missouri. As an insured depository institution under the Federal

Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

      7.    Plaintiff Northwest Bank is a bank organized and existing under the laws of the State of Illinois, with its principal place of business located at 3106 North Rockton Avenue, Rockford, Illinois. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

      8.    Plaintiff People's Bank, a Codorus Valley Company, is a bank organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 105 Ledder Heights Road, York, Pennsylvania. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

      9.    Plaintiff Sand Ridge Bank is a bank organized and existing under the laws of the State of Indiana, with its principal place of business located at 450 West Lincoln Highway, Schererville, Indiana. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

      10.    Plaintiff Bluestem National Bank is a national bank organized and existing under 12 U.S.C Chapter 2, with its principal place of business located at 104 East Locust, Fairbury, Illinois. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

11.    Plaintiff First Victoria National Bank is a national bank organized and existing under 12 U.S.C Chapter 2, with its principal place of business located at 101 S. Main Street, Victoria, Texas. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

12.    Plaintiff American Savings, FSB is a federal savings bank organized and existing under 12 U.S.C. Chapter 12, with its principal place of business located at 8230 Hohman Avenue, Munster, Indiana. Under 12 U.S.C. § 1464(f), it is a member of the Federal Home Loan Bank in its district and, as such, a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

13.    Plaintiff Mutual Federal Savings Bank is a federal savings bank organized and existing under 12 U.S.C. Chapter 12, with its principal place of business located at 10 East Charles Street, Muncie, Indiana. Under 12 U.S.C. § 1464(f), it is a member of the Federal Home Loan Bank in its district and, as such, a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

14.    Plaintiff The Dime Savings Bank, is a bank organized and existing under the laws of the State of Connecticut, with its principal place of business located at 290 Salem Turnpike, Norwich, Connecticut. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

15.    Plaintiff First National Bank (Smith Center), is a national bank organized and existing under 12 U.S.C. Chapter 2, with its principal place of business located in Smith Center, Kansas. As an insured depository institution under the Federal Deposit

4

Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

16.    Plaintiff Third Federal Savings Bank is a federal savings bank organized and existing under 12 U.S.C. Chapter 2, with its principal place of business located at 3 Penns Trail, Newtown, Pennsylvania. Under 12 U.S.C. § 1464(f), it is a member of the Federal Home Loan Bank in its district and, as such, a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

17.    Plaintiff Fidelity Bank of Florida is a bank organized and existing under the laws of the State of Florida, with its principal place of business located at 1380 North Courtenay Parkway, Merritt, Florida. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

18.    Plaintiff Citizens National Bank is a national bank organized and existing under 12 U.S.C. Chapter 2, with its principal place of business located in Henderson, Texas. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

19.    Plaintiff City National Bank is a national bank organized and existing under 12 U.S.C. Chapter 2, with its principal place of business located at 1006 Stone Road, Kilgore, Texas. As an insured depository institution under the Federal Deposit Insurance Act and a member bank of the Federal Reserve System, it is a "Financial Institution" as that term is defined in 18 U.S.C. § 20.

20.    All of the plaintiffs alleged above to be "Financial Institutions" will be collectively referred to as "Financial Institution Plaintiffs".

21.    Upon information and belief, defendant RW Professional Leasing Services, Inc. is a corporation organized and existing under the laws of the State of New York and does business under the trade name Professional Leasing Services ("Professional Leasing"), with its principal place of business located at 4584 Austin Boulevard, Island Park, New York, in the Eastern District of New York.

22.    Upon information and belief, defendant Rochelle Besser is one of the two shareholders of Professional Leasing and its president-treasurer ("Rochelle").

23.    Upon information and belief, defendant Wallace Besser is one of the two shareholders of Professional Leasing and its secretary and a vice-president ("Wallace").

24.    Upon information and belief, defendant Barry Drayer is executive vice-president of Professional Leasing ("Drayer").

25.    As a result of the foregoing, Professional Leasing is an "Enterprise" as that term is used in the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO").

26.    As a result of the foregoing and their participation in the illegal acts alleged below, Rochelle, Wallace and Drayer are participants in the Professional Leasing Enterprise.

### Jurisdiction and Venue

27.    This is an action by all plaintiffs against defendants under 18 U.S.C. § 1964(c) of RICO based on a pattern of racketeering activity during the previous two years and earlier, including repeated violations of 18 U.S.C. § 1341 ("Mail Fraud"), 18 U.S.C.

§ 1343 ("Wire Fraud") and 18 U.S.C. § 1344 ("Bank Fraud") and for supplemental and related claims under New York Common Law.

28.    As a result of the foregoing, this Court has jurisdiction of this action under 28 U.S.C. §§ 1331and 1367 and 18 U.S.C. § 1964(c).

29.    Venue is proper in this District under 28 U.S.C. § 1391(b), as all defendants may be found in this District, where they all do or transact business.

### Defendants' Wrongful Acts

30.    Professional Leasing is in the business of long term leasing of medical, dental and veterinary equipment to doctors, dentists, veterinarians and other medical providers throughout the country (the "Lessees"), a business in and affecting interstate commerce.

31.    Professional Leasing finances its business by assigning its leases to various institutional lenders, including Plaintiffs, and upon information and belief others, including other Financial Institutions, (the "Lenders") to secure loans from the Lenders pursuant to a series of agreements for each leasing transaction customarily signed on behalf of Professional Leasing by Rochelle as president.  Generally, the money for the loans would be received by Professional Leasing by wire transfer from the lender using facilities of interstate commerce.

32.    In order to induce all Plaintiffs, including the Financial Institution Plaintiffs, to finance Professional Leasing's operations as aforesaid, defendants represented, warranted and agreed, including by the mails and wire communications, *inter alia*, that: a) the assigned leases had been executed by the lessee and were valid, binding and enforceable according to their terms; b) the assigned leases were in full force

7

and effect; c) the leased equipment had been delivered to the lessees, d) the lessees were

not in default under the leases; e) Professional Leasing would remit all payments from its

leases to Plaintiffs until its borrowings were repaid; f) Professional Leasing would

segregate and cause such lease payments to be deposited in a secure escrow account, for

the benefit of and transmission to Plaintiffs; g) if any of its lessees prepaid its lease, such

prepayment would be transmitted to Plaintiffs within three days of receipt; h) if any

Plaintiff-financed lease was in default, Professional Leasing would substitute new leases

of equal or greater value; i) Professional Leasing owned the leased equipment and the

assigned leases subject only to the rights of the lessees; j) Professional Leasing had not

assigned, transferred or otherwise encumbered the assigned interests; and k) it had not

conveyed any security interest in the Leases. (Samples of the forms used, documenting

such representations, are annexed as Exhibit A).

     33.    At the time of such representations, defendants knew that many of its

factual representations were false and they had no present intention of performing their

representations as to the future and instead were engaged in a pattern of systematically

and knowingly breaching all such prior lease financing transactions and therefore knew

such representations to be false.

     34.    Such representations, made by defendants and known by them to be false,

were justifiably relied upon by Plaintiffs, to their detriments, in agreeing to and making

the loans to Professional Leasing described herein.

     35.    In justifiable reliance upon defendants' alleged representations, each of the

plaintiffs entered into loan transactions with Professional Leasing, all of which were

substantially similar, that are reflected on the schedules annexed as Exhibit B, showing a

total of $17,581,258.21 in unpaid principal and $282,728.93 in unpaid interest due as of

March 31, 2002, for a total of $17,863,987.14, broken down as follows:

| Plaintiff | Principal Due | Interest Due | Total Due |
|---|---|---|---|
| Crawford & Sons | $ 807,407.51 | $ 7,027.20 | $ 814,434.71 |
| James A. Crawford | $ 73,608.85 | $ 1,231.56 | $ 74,840.41 |
| East Prospect State Bank | $ 867,051.33 | $ 19,926.70 | $ 886,978.03 |
| Equitable Bank | $1,372,264.10 | $ 19,935.51 | $1,392,199.61 |
| First National Bank (Scott City) | $ 568,042.89 | $ 19,388.33 | $ 587,431.22 |
| First Security State Bank | $1,225,095.39 | $ 7,542.87 | $1,232,638.26 |
| Northwest Bank | $ 472,741.48 | $ 6,038.90 | $ 478,780.38 |
| People's Bank | $1,891,441,32 | $ 50,578.65 | $1,942,019.97 |
| Sand Ridge Bank | $ 125,010.90 | $ 4,590.90 | $ 129,601.80 |
| Bluestem National Bank | $ 574,362.97 | $ 9,296.31 | $ 583,659.28 |
| First Victoria National Bank | $ 617,683.71 | $ 12,091.55 | $ 629,775.26 |
| American Savings, FSB | $ 920,835.31 | $ 7,260.09 | $ 928,095.40 |
| Mutual Federal Savings Bank | $1,326,787.37 | $ 12,957.00 | $1,336,084.37 |
| The Dime Savings Bank | $1,371,333.66 | $ 23,735.02 | $1,395,068.68 |
| First National Bank (Smith Center) | $ 269,022.21 | $ 4,590.90 | $ 273,613.11 |
| Third Federal Savings Bank | $3,472,797.00 | $ 26,197.00 | $3,498,976.00 |
| Fidelity Bank of Florida | $ 775,532.52 | $ 40,000.00 | $ 815,532.52 |
| Citizens National Bank | $ 562,094.74 | $ 5,089.69 | $ 567,184.43 |
| City National Bank | $ 288,144.95 | $ 0.00 | $ 288,144.95 |

36.    For each lease financing transaction, Professional Leasing executed: a) a promissory note in favor of the plaintiff involved; b) a security agreement and assignment of lease in favor of such plaintiff; and c) a service agreement in favor of such plaintiff. In most instances, Professional Leasing also executed an escrow agreement with the Bank of New York as escrowee, requiring that all monies received from the Lessee involved be deposited with the Bank of New York to be applied to payment of the respective loan obligations.

37.    Contrary to its representations and agreements, defendants: a) failed to remit payments received by them from lessees to Plaintiffs; b) diverted and commingled such lease payments with Professional Leasing's general operating account rather than have them escrowed for transmission to Plaintiffs; c) failed to notify Plaintiffs of Lessees' pre-payment of certain leases and failed to remit all remaining principal due therein within three days; d) failed to notify Plaintiffs of leases in default or to replace them with new leases of equal or greater value; e) failed to deposit or cause the deposit of lease payments received from the Lessees with the Bank of New York as escrowee; f) entered into lease financing transactions with Plaintiffs in which there was no actual underlying lease with a medical provider lessee; and g) financed the same lease with more than one lender.

38.    Defendants have taken steps to conceal their fraud from plaintiffs and the other lenders, including: a) creating bogus checks supposedly written by a lessee in payment of his or her lease obligations and then sending a photocopy of the bogus check to the lender; b) altering Professional Leasing's records to make them coincide with the bogus checks rather than the actual payments; c) renting a number of mail boxes

throughout the country supposedly in the name of Professional Leasing's lessees so that Professional Leasing could conceal its conversion of lease payments, the lessees' defaults, the non-existence of the underlying lease transactions and the financing of the same lease with more than one lender; d) creating records in the name of Riteway Health Services, Inc. ("Riteway"), a non-existent company supposedly in the medical equipment supply business that purportedly supplied the equipment for non-existent leases presented to plaintiffs for funding by plaintiffs; and e) forging the signatures of purported lessees.

39.     As part of defendants' ongoing fraud, after plaintiff Crawford & Sons, Ltd. Profit Sharing Plan ("Crawford") was assigned an equipment lease to a physician named Macauley A. Ojeaga on or about October 22, 2001, for which Crawford loaned $394,030.68 to Professional Leasing ($378,721.05 is the current principal balance of the loan), conveying the moneys loaned to Professional Leasing by wire transfer using instruments of interstate commerce, in or around February, 2002, Dr. Ojeaga refinanced his loan with a local Texas bank and paid off his lease from Professional Leasing, which gave Dr. Ojeaga a satisfaction. Professional Leasing did not inform Crawford of this transaction and did not remit any of the proceeds of it to Crawford.

40.     As part of defendants' ongoing fraud, on or about May 8, 2001, Professional Leasing assigned a number of leases to plaintiff Northwest Bank ("Northwest"), including an equipment lease to a physician named Kodihalle Prosannakuma for which Northwest loaned $69,699.31 to Professional Leasing, which loan is totally unpaid. That transaction was fraudulent in that Dr. Prosannakuma has submitted to Northwest affidavits establishing that he has not entered into the purported transaction with Professional Leasing and that his signature has been forged on the

transaction documents.  On or about May 3, 2002, a law firm representing Professional Leasing sent Northwest its client's documents on that transaction, including documents containing the forged signature of Dr. Prosannakuma as established by comparison with the signatures on his affidavits.

41.    As part of defendants' ongoing fraud, among the leases assigned to Northwest, on or about May 8, 2001, was a lease of purportedly new equipment to a dentist named Raymond G. Nikodem for which Northwest loaned $34,475.28 to Professional Leasing ($32,924.18 is the current principal balance of such loan).  To support the loan, Professional Leasing's documentation included an invoice from non-existent Riteway for new equipment supposedly leased to D. Nikodem.  Dr. Nikodem has informed Northwest that he changed his mind after signing a few documents, that he believed his loan was unsecured, that he never received new dental equipment and that the equipment he uses in his practice is over ten years old and wholly owned by him.

42.    As part of defendants' ongoing fraud, after plaintiff Peoples Bank ("People's") was assigned two equipment leases, including equipment purportedly purchased from non-existent Riteway, to two medical corporations named Karyn L. Grossman, M.D., Inc. and Steven A. Teitelbaum, M.D. as co-lessees on or about December 29, 1999 for which People's loaned $290,779.20 to Professional Leasing ($176,483.72 is the current principal balance of the loan), the principals of the two medical corporations informed People's that their lease was refinanced by another lender to Professional Leasing.  Professional Leasing did not inform Peoples of this transaction and did not remit any of the proceeds of it to Peoples.  On information and belief,

Professional Leasing fraudulently did not inform the new lender of its prior transaction with People's.

      43.     As part of defendants' ongoing fraud, after People's was assigned two equipment leases, one to Dr. Sul's Family & Sports Medicine Associates, P.A. ("Dr. Sul's") and the other to Sixth Avenue Family Practice, P.C. ("Sixth Avenue") on or about February 2, 2001 for which People's loaned $352,062.25 to Professional Leasing ($68,582.78 is the current principal balance of the loan), Dr. Sul's informed People's that it had paid off the lease to Professional Leasing by a check dated June 1, 2001, a copy of which it furnished People's, and Sixth Avenue informed People's that it had paid off the lease over time with its final payment in the fall of 2001. Professional Leasing did not inform People's of these transactions and did not remit any of the proceeds of them to People's.

      44.     As part of defendants' ongoing fraud, after First Victoria National Bank ("First Victoria") was assigned an equipment lease to a professional corporation named Donald F. Alemeida and Associates, D.D.S., P.C. on or about January 28, 1999 for which First Victoria loaned $116,000 to Professional Leasing ($71,551 is the current principal balance of the loan) while on or about the next day, January 29, 1999, Professional Leasing purported to assign to plaintiff Fidelity Bank of Florida ("Fidelity") the Almeida lease and Fidelity loaned Professional Leasing $249,990.58 ($99,635.25 is the current principal balance of the loan), Dr. Almeida informed First Victoria and Fidelity that his lease had been paid off as confirmed by a letter from Professional Leasing dated November 8, 2001, and that he had received letters from a bank in Philadelphia, Pennsylvania stating that it had been assigned the same lease by Professional Leasing.

Professional Leasing did not inform First Victoria or Fidelity of these transactions and did not remit any of the proceeds of them to First Victoria or Fidelity.

45.    As part of defendants' ongoing fraud, after plaintiff Sand Ridge Bank ("Sand Ridge") was assigned an equipment lease to a dentist named Thomas V. Hausen on or about May 30, 1998 for which Sand Ridge loaned $87,382.71 to Professional Leasing ($50,962.79 is the current principal balance of the loan), Dr. Hausen informed People's that he had paid off his equipment lease on or about October 18, 1999 as confirmed by a belated letter from Professional Leasing dated February 14, 2000. Professional Leasing did not inform Sand Ridge of this transaction and did not remit any of the proceeds of it to Sand Ridge.

46.    As part of defendants' ongoing fraud, on or about June 28, 2000, Professional Leasing assigned to plaintiff Bluestem National Bank ("Bluestem") an equipment lease to a physician named Jeffrey A. Quitman for which Bluestem loaned $57,004.64 to Professional Leasing, which loan is totally unpaid. Dr. Quitman was the victim of a catastrophic automobile accident on or about June 12, 2000 that left him in a coma until on or about June 30, 2000 and left him permanently disabled. He never received the equipment. Professional Leasing assigned Dr. Quitman's lease to Bluestem while Dr. Quitman was in a coma, never re-paid its loan and never explained what happened to the equipment involved.

47.    As part of defendants' ongoing fraud, on or about June 28, 2000, Professional Leasing assigned to Bluestem an equipment lease to a corporation named Broadmoor Veterinary Clinic, inc. ("Broadmoor") for which Bluestem loaned $93,206.60 to Professional Leasing, which loan is totally unpaid, while on or about August 29, 2000,

Professional Leasing purported to assign Broadmoor's lease to First Victoria and First

Victoria loaned Professional Leasing $157,000 ($152,400 is the current principal balance

of the loan). Although Broadmoore's principal, Dr. Eugene Clothier, reported that he had

filed for bankruptcy during 2001 and that the five lenders (presumably including First

Victoria and Bluestem) had each claimed an assignment of on the leases and equipment

was now being financed by American Express, Professional Leasing never informed

either Bluestem or First Victoria of these transactions and did not remit any proceeds to

either Bluestem or First Victoria.

48.    As part of defendants' ongoing fraud, on or about February 1, 2002,

Professional Leasing assigned to plaintiff Mutual Federal Savings Bank ("Mutual") two

equipment leases to two professional associations named Michael Mohan, MD, PA and

Floralba Vuelta, P.A. for which Mutual loaned $103,632.13 and $68,487, respectively, to

Professional Leasing. Professional Leasing wrote a letter to Mutual dated April 12, 2002

stating that the transactions with the two professional associations were never funded.

Nevertheless, it retained the loan proceeds and never repaid them.

49.    As part of defendants' ongoing fraud, on or about May 12, 2000,

Professional Leasing assigned to plaintiff The Dime Savings Bank ("Dime") two

equipment leases to a limited liability company called Physicians Advanced Health Care

Group, LLC for which Dime loaned $1,104,672.02 to Professional Leasing

($1,101,945.45 is the current principal balance of the loan). Drayer, on behalf of

Professional Leasing, informed Dime on or about June 6, 2002, that the equipment was

either never purchased after the limited liability company cancelled the order or was

refinanced by another bank. Professional Leasing did not inform Dime of these

15

transactions until June 6, 2002 and did not remit any of the proceeds of this transaction to Dime.

50.     As part of defendants' ongoing fraud, on or about April 8, 2002, Professional Leasing provided a report to plaintiff Third Federal Savings Bank ("Third Federal") stating that $3,700,272 was due on leases assigned to Third Federal although on or about February 28, 2002 Professional Leasing provided a report stating that $4,295,339 was due on such leases. Defendants' claim that the decrease on the balance due reflected payments from lessees, although no payments had been received by Third Federal after February 28, 2002

51.     On or about June 20, 2002, the United States Attorney for the Eastern District of New York initiated criminal proceedings in this Court for alleged Bank Fraud against Rochelle, Drayer and others affiliated with Professional Leasing by a complaint and affidavit in support of arrest, search and seizure warrants signed and verified by Rondie Peiscop-Grau, a special agent with the Federal Bureau of Investigation, specifying additional fraudulent practices and transactions by defendants, uncovered as a result of her investigation, including the forged lease with Dr. Prosannakuma alleged in paragraph 39 (copies of the complaint and affidavit are annexed as Exhibit C).

52.     Defendants have committed similar acts of fraud with respect to each of the plaintiffs herein. On information and belief, during the course of the criminal proceeding and in the discovery in this action, additional specific instances of fraud on the part of defendants will be established.

53.     Each of the transactions involving plaintiffs alleged in paragraphs 39 to 50 above constitute Wire or Bank Fraud and therefore, regardless of any other criminal act

by defendants, establish many more than the two acts of racketeering activity necessary

to constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). Such

pattern is further documented in the criminal complaint annexed as Exhibit C.

     54.    Professional Leasing informed Plaintiffs that it would not make any

payments of principal and interest due commencing in April 2002, and has, in fact, failed

to make such payments to plaintiffs.

     55.    Pursuant to the terms of the Security Agreements, Plaintiffs have an

undivided security interest in, and were assigned all of Professional Leasing's right, title

and interest in and to the equipment leases.

     56.    All Plaintiffs have notified Professional Leasing of its defaults on the

Promissory Notes executed by Professional Leasing in favor of Plaintiffs and required

Professional Leasing to undertake various actions designed to protect Plaintiff's interests

in accordance with Professional Leasing's obligations to Plaintiffs and the Promissory

Notes, Security Agreements, Servicing Agreements and Escrow Agreement.

<strong>As and For a First Claim By All Plaintiffs<br>Against Defendants (RICO § 1962(c))</strong>

     57.    Plaintiffs repeat each and every allegation of paragraphs 1 through 56

hereof.

     58.    Defendants agreed to and did conduct and participate in the conduct of the

Professional Leasing Enterprise through a pattern of racketeering activity and for the

unlawful purpose of intentionally defrauding of Plaintiffs, including the Financial

Institution Plaintiffs and by use of the mails and wire communications as above alleged.

59.    Pursuant to and in furtherance of their fraudulent scheme, defendants committed multiple related acts of mail fraud, wire fraud and bank fraud as above alleged.

60.    The acts alleged constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).

61.    Rochelle, Wallace and Drayer have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and related activity alleged above, in violation of 18 U.S.C. § 1962(c).

62.    As a direct and proximate result of defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that they have lost the principal and interest set forth in paragraph 35 hereof.

### As and For A Second Claim By All Plaintiffs
### Against Defendants (RICO § 1962(a))

63.    Plaintiffs repeat each and every allegation of paragraphs 1 through 56 hereof.

64.    Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate Enterprise, specifically the loans from Plaintiffs to Professional Leasing ostensibly secured by the leases to the Lessees.

65.    The foregoing constitutes a pattern of racketeering pursuant to 18 U.S.C. § 1961(5).

66.    As a direct and proximate result of defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property in that they have lost the principal and interest set forth in paragraph 35 hereof.

**As and For a Third Claim By All Plaintiffs**
**Against Defendants (RICO § 1962(b))**

67.    Plaintiffs repeat each and every allegation of paragraphs 1 through 56 hereof.

68.    Rochelle, Wallace and Drayer acquired and maintained interests in and control of the Enterprise through the pattern of racketeering activity alleged above and in violation of 18 U.S.C. § 1962(b).

69.    As a direct and proximate result of defendants' racketeering activity and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property in that they have lost the principal and interest set forth in paragraph 35 hereof.

**As and For a Fourth Claim By All Plaintiffs**
**Against Defendants (RICO § 1962(d))**

70.    Plaintiffs repeat each and every allegation of paragraphs 1 through 56 hereof.

71.    As alleged above, defendants agreed and conspired to violate 18 U.S.C. § 1962(a), (b) and (c).

72.    Defendants have intentionally used or invested income that it derived from a pattern of racketeering activity in an interstate Enterprises (§ 1962(a)), have acquired or maintained interests in the Enterprise through a pattern of racketeering activity (§ 1962(b)), and have conducted and participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity (§ 1962(c)), knowing their predicate acts were part of a pattern of racketeering activity and agreeing to the commission of the acts alleged to further the schemes described above.

19

73.    As a result of the foregoing, defendants have engaged in a conspiracy in violation of 18 U.S.C. § 1962(d).

74.    As a direct and proximate result of defendants' conspiracy and their overt acts in furtherance of it, Plaintiffs have been injured in their business and property in that they have lost the principal and interest alleged in paragraph 35 hereof.

### As and For a Fifth Claim By All Plaintiffs Against Defendants (Common Law Fraud)

75.    Plaintiffs repeat each and every allegation of paragraphs 1 through 56 hereof.

76.    The foregoing constitutes fraud under New York Common Law.

77.    By reason of the foregoing, Plaintiffs have been injured in their business and property in that they have lost the principal and interest alleged in paragraph 35 hereof.

78.    As a result of the foregoing, defendants are liable to Plaintiffs for their damages with interest and punitive damages.

### As and For a Sixth Claim By All Plaintiffs Against Professional Leasing (The Promissory Notes)

79.    Plaintiffs repeat each and every allegation of paragraphs 1 through 56 hereof.

80.    Professional Leasing has executed and delivered to Plaintiffs promissory notes as set forth in Exhibit D.  Samples of these promissory notes are annexed collectively as Exhibit E.

81.    Defendants have stated to Plaintiffs that Professional Leasing does not intend to make any further payments on its said notes and, in fact, have failed to do so since April, 2002.

82.    As a result of the foregoing, Professional Leasing is in default with respect to the aforesaid notes.

83.    By reason of the foregoing, Professional Leasing now owes Plaintiffs the sum as set forth in paragraph 35 hereof.

WHEREFORE, Plaintiffs demand judgment against the defendants as follows:

(a)    On the First, Second, Third and Fourth claims in favor of all Plaintiffs against defendants in triple the sum alleged in paragraph 35 hereof plus interest and a reasonable attorneys' fee;

(b)    On the Fifth claim, in favor of all Plaintiffs against defendants in the sum alleged in paragraph 35 hereof plus interest and for punitive damages;

(c)    On the Sixth claim in favor of all Plaintiffs against Professional Leasing in the sum alleged in paragraph 35 hereof plus interest;

(d)    For the costs and disbursements of this action; and

(e)    For and such other and further relief as may be just.

Dated: New York, New York
       July 12, 2002

MARGOLIN & PIERCE, LLP

By: _Errol F. Margolin_
Errol F. Margolin
Attorneys for Plaintiffs
1370 Avenue of the Americas
New York, NY 10019
(212) 247-4844